IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RETAIL INDUSTRY LEADERS          *
ASSOCIATION                      *
                                 *
        v.                       *    Civil No. JFM-06-316
                                 *
JAMES D. FIELDER, JR.,           *
MARYLAND SECRETARY OF LABOR,     *
LICENSING, AND REGULATION        *

*****

OPINION

Retail Industry Leaders Association ("RILA"), a trade association of which Wal-Mart

Stores, Inc. ("Wal-Mart") is a member, has brought this action for declaratory and injunctive

relief against James Fielder, Jr., in his official capacity as Maryland Secretary of Labor,

Licensing, and Regulation ("the Secretary").[1]  RILA seeks a declaration that the Maryland Fair

Share Health Care Fund Act ("the Act" or "the Fair Share Act"), Md. Code Ann., Lab. & Empl. §

8.5-101 *et seq.*, is preempted by the federal Employment Retirement Income Security Act of

1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"), and that the Act violates the Equal Protection Clause

of the U.S. Constitution.[2]

RILA has filed a motion for summary judgment, and the Secretary has filed a motion to

dismiss or for summary judgment.  RILA's motion will be granted, and the Secretary's motion

---

[1]This court's respect for the State of Maryland renders the granting of injunctive relief
entirely unnecessary.

[2]In its complaint RILA also seeks the declaration that the Act violates the ban on "special
legislation" imposed by the Maryland Constitution.  Md. Const., art. III, § 33.  At the initial
scheduling conference held in this case, I indicated that I would be inclined to certify this issue
for resolution by the Maryland Court of Appeals, and the issue is not addressed by the pending
motions.

will be denied.

## I.

On January 12, 2006, the Maryland General Assembly enacted the Fair Share Act, which is scheduled to become effective January 1, 2007.  Md. Code Ann., Lab. & Empl. § 8.5-103(a)(1).  The Act applies only to non-governmental employers of 10,000 or more people in the State.  *Id*. § 8.5-102.  It requires that a for-profit employer that "does not spend up to 8% of the total wages paid to employees in the State on health insurance costs shall pay to the Secretary an amount equal to the difference between what the employer spends for health insurance costs and an amount equal to 8% of the total wages paid to employees in the State."  *Id*. § 8.5-104(b).  For non-profit employers, the benchmark is 6%.  *Id*. § 8.5-104(a).  The Act also requires an employer to report annually its total number of employees in the state, the amount spent by the employer on health insurance costs, and the percentage of payroll spent by the employer on health insurance costs.  *Id*. § 8.5-103.  The Act defines "health insurance costs" as "the amount paid by an employer to provide health care or health insurance to employees in the State to the extent the costs may be deductible by an employer under federal tax law."  *Id*. § 8.5-101(d)(1).

There are four non-governmental employers of 10,000 or more people in Maryland: Johns Hopkins University ("Johns Hopkins"), Northrop Grumman Corp. ("Northrop Grumman"), Giant Food Inc. ("Giant Food"), and Wal-Mart.  When enacting the law, the Maryland General Assembly anticipated that only Wal-Mart would be affected by the Act's spending requirement.[3]

---

[3]*See, e.g.*, Floor debate on Senate Bill 790, 2006 Leg., 421st Sess. (Md. Jan. 12, 2006) (statement of Sen. Miller, co-sponsor of the law) ("Is Wal-Mart afraid?  You bet they are."); Floor debate on House Bill 1284, 2006 Leg., 421st Sess. (Md. Jan. 12, 2006) (statement of Del. Healey, co-sponsor of the law) ("We don't want to kill Wal-Mart.  We don't want to kill this giant.  We want this giant to behave itself."); Fiscal and Policy Note Revised 2005, H.B. 1284 at

Johns Hopkins is a non-profit institution that meets the lower 6% standard the legislature set for non-profits.  Northrop Grumman successfully lobbied for a provision in the Act that permits employers to exclude, for purposes of calculating the percentage of payroll spent on health care, compensation paid to its employees above the median household income in Maryland.  *Id*. § 8.5-103(b).  This exclusion permits Northrop Grumman to meet the requirement.  Giant Food, which actively lobbied for enactment of the legislation, spends substantially in excess of 8% of the total wages it pays to employees in Maryland on health insurance costs.  On the other hand, according to the declaration submitted by Gregory Goggans, Wal-Mart's Director of United States Benefits Design, "Wal-Mart has never [since July 2003] made contributions to the health care plans offered to its Maryland employees that were equal to or greater than 8% of the 'total compensation' (as that term is defined in the Act) paid to Maryland employees."  Goggans Decl. ¶ 3, RILA Mot. for Summ. J. ex. D.[4]

II.

As a preliminary matter, the Secretary challenges RILA's standing to bring this action. Standing is an aspect of the "case or controversy" requirement which limits the reach of federal jurisdiction under Article III of the U.S. Constitution.  Essentially, the question of standing is based on "whether the litigant is entitled to have the court decide the merits of the dispute or of

---

2-3, RILA Mot. for Summ. J. ex. 1 (referring repeatedly in the "Background" section to Wal-Mart).

[4]As discussed in Section II.A, *infra*, Frank Boston, an attorney for Wal-Mart, during the hearings leading to the passage of the Act, indicated that Wal-Mart may spend 10 to 12% of its payroll on health care benefits in Maryland.  However, as also discussed in Section II.A, taken as a whole the record establishes that Wal-Mart's health care expenditures in Maryland do not meet the Act's 8% requirement.

3

particular issues." *Allen v. Wright*, 468 U.S. 737, 750-51 (1984) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  The burden of showing standing lies with the party invoking federal jurisdiction.  *Marshall v. Meadows*, 105 F.3d 904, 906 (4th Cir. 1997).  Standing encompasses both a constitutional aspect drawn directly from the Constitution, and a prudential aspect drawn from the self-imposed limitations on the federal judiciary.  *Allen*, 468 U.S. at 751; *see also Burke v. City of Charleston*, 139 F.3d 401, 405 (4th Cir. 1998).

An association may have standing in its own right, based on injuries suffered to the association itself, or through "associational standing," by which it asserts the rights of its members.  RILA does not contend that it has itself been injured by passage of the Fair Share Act.  Rather, it argues that it has associational standing to litigate the interests of its members.  As articulated by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission*, an association has standing to assert the rights of its members if: (1) the association's members would have standing to sue in their own right, (2) the interests the association seeks to protect are "germane to the organization's purpose," and (3) the claim asserted and the relief requested do not require the participation of individual members in the lawsuit.  432 U.S. 333, 343 (1977).

## A.

In order to meet the first *Hunt* requirement, it is not necessary that all of an association's members would have standing to sue in their own right.  It is sufficient if any one of the members could institute the action on its own behalf.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992); *Warth*, 422 U.S. at 511.  To establish its own constitutional standing, an individual member would have to satisfy three elements: "(1) that . . . [it] personally has suffered actual or threatened injury that is concrete and particularized, not conjectural or

hypothetical; (2) that the action fairly can be traced to the challenged action; and (3) that the injury is likely to be redressed by a favorable decision from the court." *Burke*, 139 F.3d at 405; *see also Lujan*, 504 U.S. at 560-61; *Allen*, 468 U.S. at 751.

The second and third of these three elements require no discussion.  The injuries alleged by RILA on behalf of its members are unquestionably fairly traceable to the Act whose validity it challenges, and these injuries would be redressed by this court's granting of the declaratory and injunctive relief.  *See Warth*, 422 U.S. at 515.  Therefore, the only individual standing requirement that needs to be addressed is whether a RILA member has "suffered an actual or threatened injury that is both concrete and particularized."

RILA asserts that at least one of its members – Wal-Mart – meets this element. According to RILA, Wal-Mart faces three different types of actual or threatened injury, any one of which is concrete and particularized.  RILA's position is correct in all respects.

First, the Act mandates that an employer subject to its terms must report on an annual basis information such as the number of employees, the amount spent in the preceding year on health insurance in Maryland, and the percentage of payroll that amount constitutes.  Md. Code Ann., Lab. & Empl. § 8.5-103.  Although the time and cost incurred in meeting this reporting requirement is somewhat trivial since ERISA imposes similar obligations, unquestionably it is both a concrete and particular burden to be required to file a report that need not be filed if the Act is unlawful.

Second, as long as the validity of the Act remains undetermined, Wal-Mart will be required to alter the administration of its ERISA plan by allocating health care expenditures in Maryland in a way that ensures that the 8% spending requirement set by the Act is met.  Again,

this burden is not hypothetical.  It is concrete and particular, as required for purposes of establishing constitutional standing.

Third, the record establishes that Wal-Mart is affected by the Act's spending requirement.  As stated above, RILA has submitted the declaration of Gregory Goggans, Wal-Mart's Director of United States Benefits Design, who states under the penalty of perjury that since 2003 "Wal-Mart has never made contributions to the health care plans offered to its Maryland employees that were equal to or greater than 8% of the 'total compensation' (as that term is defined in the Act) paid to Maryland employees."  Goggans Decl. ¶ 3.

The Secretary argues that Goggans' averment is questionable, pointing to a statement made by Frank Boston, an attorney for Wal-Mart, during a committee hearing prior to the passage of the Act, to the effect that Wal-Mart's contribution to health care benefits "could be at 10 or 12 percent."  Senate Finance Committee meeting on Senate Bill 790, 2005 Leg., 420th Sess. 60 (Md. Mar. 2, 2005), Sec'y Mot. to Dismiss ex. 2.  The Secretary has, however, taken Boston's statement out of context.  Just before Boston spoke, Lisa Woods, Wal-Mart's National Director of Benefits, testified that Wal-Mart's employee health care expenditures "fall between 7 and 8 percent" of payroll.  *Id*. at 53-54.  A committee member then noted that "last year . . . [Wal-Mart] said that you paid 5 percent of your payroll in health care.  Now you are saying it is between 7 and 8 percent?"  *Id*. at 59.  It was in response to that question that Boston made his 10 to 12% remark, explaining that Wal-Mart had been unsure of the precise percentage of payroll because at the time it was unclear how wages and expenditures might be defined under the law. He then said that without more clarity Wal-Mart "could be at 10 or 12 percent."  *Id*. at 60.  He further indicated, however, that "Lisa Woods spent plenty of time researching the definite areas

6

of the law," and her testimony that expenditures fell between 7 and 8% was "based off the definition under this bill." *Id.* Against this background, Boston's remark upon which the Secretary relies is clearly without evidentiary value.[5]

B.

The second requirement for associational standing established by *Hunt* is that the interests the association seeks to protect are germane to its purpose. This requirement is clearly met in this case. RILA's website identifies the opposition of health care mandates as one of its priorities in its 2006 public policy agenda:

> Many states and localities, and even some in Congress, are promoting healthcare mandates that would drive up costs and seriously undermine the economic health of the retail sector. Some policies would mandate certain employers spend a specific percentage of their payroll on healthcare, or pay a tax to fund public health insurance programs. Others would impose onerous new reporting requirements about employees who receive public benefits. RILA will adamantly oppose legislative efforts and ballot initiatives that would impose costly healthcare mandates on the retail industry, particularly mandates that disproportionately impact a specific segment of the industry.

RILA Public Policy Agenda 2006, *available at* http://www.retail-leaders.org/new/rlGovAffairs. aspx?section=GOVPU5. This statement speaks for itself and is clearly sufficient to meet the "germaneness" prong of the *Hunt* test. The Secretary does not contend to the contrary.

C.

The third standing element RILA must satisfy under *Hunt* is that the claim it asserts and

---

[5]Moreover, the Attorney General of Maryland himself assured the Maryland General Assembly that "Wal-Mart has health insurance costs low enough to be subject to [the Act's] payroll assessment." Letter from J. Joseph Curran, Jr., Attorney General, to Michael E. Busch, Speaker of the House at 1 (Jan. 9, 2006). Further, if the Secretary's present contention is to be believed, the Maryland General Assembly wasted a considerable amount of taxpayer money in enacting a piece of legislation which would have no effect at all.

the relief it requests do not require the participation of its individual members in the lawsuit.

(1)

The Secretary argues that Wal-Mart's individual participation is required in order to clarify the level of Wal-Mart's health expenditures.  However, as indicated above, I am satisfied that the record already is sufficient to establish that Wal-Mart's health care expenditures are below the 8% statutory threshold.  At the least, the record demonstrates that Wal-Mart's health care expenditures are sufficiently close to the line that it faces threatened injury from the Act's spending requirement.  Moreover, the question of the amount of Wal-Mart's health care expenditures aside, I further find, as also indicated above, that the Act imposes legally cognizable injury upon Wal-Mart by requiring it to make a report to the Secretary about the amount of its payroll and health care contributions and by requiring it to track and allocate benefits for its Maryland employees in a manner different from that in which it tracks and allocates benefits for its employees in other States.

(2)

The Fourth Circuit's decision in *Maryland Highways Contractors Ass'n v. Maryland* establishes another factor that must be considered in determining whether Wal-Mart's participation in this action is necessary.  933 F.2d 1246 (4th Cir. 1991) ("*MHCA*").  In *MHCA*, a contractors' association brought a suit to challenge Maryland's Minority Business Enterprise ("MBE") statute, which set a percentage spending goal for public departments to allocate contracts to minority-owned businesses.  The district court held that the association had no standing to sue, and while the decision was pending on appeal, Maryland repealed the MBE statute in question and replaced it with a new statute.  This rendered the appeal moot, and the

8

Fourth Circuit vacated the district court's grant of summary judgment and remanded with instructions to dismiss.  However, the court went on to address the issue of standing "in order to guide subsequent litigation." *Id.* at 1250.[6]  The Fourth Circuit explained that where there is an actual conflict of interest among the members of an association, it may be necessary for individual members to participate in order to protect their diverse interests. *Id*. at 1252.  That such a conflict existed in *MHCA* was obvious because while some of the members of the contractors association may have been harmed by the MBE statute, others were benefitted by it.

In contrast, in this case there is no evidence of any conflict of interest among the members of RILA.  There are some retailers, such as Giant Food, that may support the Act, but Giant Food is not a member of RILA.  There is nothing in the record to suggest there is any member of RILA who favors the Act.  Indeed, as previously indicated, RILA's website makes clear that opposing statutory health care mandates is one of its missions.  Further, although the Secretary (without evidentiary support) suggests that Target, a RILA member, might support the

---

[6]RILA contends that the court's discussion of standing in *MHCA* was purely dictum.  The Fourth Circuit itself, however, has indicated that statements it makes in its decisions should not be considered dictum unless it is possible that they "may not have received the full and careful consideration of the courts that uttered it." *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999).  In *MHCA* the court unquestionably gave full and careful consideration to the standing issue.

RILA also argues that *MHCA* is contrary to Supreme Court precedent derived from *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock*, 477 U.S. 274 (1986) ("*UAW*").  There, the Court opined that "[t]he very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interest." *Id*. at 290.  *UAW*, however, predates the Fourth Circuit's decision in *MHCA*, and any argument that *MHCA* is inconsistent with *UAW* must be considered by the Fourth Circuit.  This is not to suggest that any such inconsistency exists.  Whatever the general rule might be, *MHCA* provides a paradigm case in which the interest of individual members of an association conflict with one another, and it provides a clear example of the need to exercise sound judgment, rather than to act mechanically, in applying any general rule, however clearly established it may seem to be.

Act because its effect may be to increase Wal-Mart's costs, the record establishes that Target's

President, Gregg Steinhafel, was present at the RILA board meeting in which RILA voted to

bring suit and voted in favor of the action.[7]

III.

In addition to contesting RILA's standing, the Secretary also contends that this case is

not ripe for judicial review.  To a large extent, the Secretary's contention is based upon the

argument that RILA has not established that Wal-Mart has suffered any actual or threatened

injury which is concrete and particularized.  I addressed this argument in the previous section of

the Opinion.  The only two additional arguments that the Secretary makes are that resolution of

the issues in this case should await the passing of the effective date of the Act and that the

Secretary has not yet promulgated any regulations under the Act.

---

[7]The Secretary also contends that RILA should be denied standing because unless Wal-Mart is a party plaintiff, he will not be able to take advantage of the Fourth Circuit's holding in *Barwick v. Celotex Corp.*, that a "genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."  736 F.2d 946, 960 (4th Cir. 1984).  According to the Secretary, the statement of Frank Boston, an attorney representing Wal-Mart before a Senate hearing, that Wal-Mart's health care expenditures "could be at 10 or 12 percent" of its payroll is binding upon Wal-Mart and converts the contrary declaration of Gregory Goggans, Wal-Mart's Director of United States Benefit Design, into a "sham affidavit."  This argument is frivolous.  For the reasons stated in the text, *supra*, the Secretary has taken Boston's statement out of context, and it is clearly not the kind of admission that would justify invocation of the *Barwick* rule.

Another argument made by the Secretary – that Wal-Mart must be a party to the case in order for him to inquire into the actual extent of Wal-Mart's health care expenditures – is equally off-base.  Although Wal-Mart's absence as a plaintiff precludes the Secretary from directing interrogatories to it, the Secretary obviously can obtain both testimony and documents from Wal-Mart by means of third-party discovery.  Moreover, the Secretary has cited no case in which *intra*-litigation problems a defendant may confront constitute the type of prudential consideration that should lead to the denial of standing.  Rather, prudential considerations come into play in order to assure that a claim being asserted by a third party is not merely "an abstract, generalized grievance that the courts are neither well equipped nor well advised to adjudicate." *Sec'y of State of Maryland v. Joseph H. Munson Co.*, 467 U.S. 947, 955 n.5 (1984).

The first of these arguments is puzzling in light of the fact that the Secretary (as well as RILA) agreed to expedited proceedings in this case precisely so that the Fourth Circuit would have an opportunity to rule upon the issues prior to the effective date of the Act.  This agreement was based upon, and reflects, the self-evident proposition that order is preferable to chaos.  It is both in the public interest and in the interest of RILA and Wal-Mart to have the question of the validity of the Act determined, insofar as possible, prior to January 1, 2007.  As for the Secretary's contention that resolution of the issue should await his promulgation of regulations, the clear and succinct answer is that the text of the regulations will not affect in any way the legal challenges RILA has made.

IV.

The Secretary next argues that the Act imposes a "payroll tax" upon covered employers and that the Tax Injunction Act ("TIA") therefore strips this court of jurisdiction to hear the case.

The TIA, in its entirety, provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.  A challenge to a district court's jurisdiction under the TIA typically raises two questions: "First, do the state courts provide a 'plain, speedy and efficient' remedy?  Second, is the state or local law a 'tax,' or is it a regulatory fee that falls outside the restrictions of the [TIA]?"  *Collins Holding Corp. v. Jasper County*, 123 F.3d 797,

799 (4th Cir. 1997).[8]  Only the latter question is relevant here because, as RILA acknowledges,

Maryland's courts would provide a fully adequate forum for hearing and resolving its claims.

Writing for the First Circuit in *San Juan Cellular Telephone Co. v. Public Service*

*Commission*, then-Chief Judge Breyer surveyed prior courts' attempts to differentiate between taxes

and regulatory fees:

> They have sketched a spectrum with a paradigmatic tax at one end and a paradigmatic
> fee at the other.  The classic "tax" is imposed by a legislature upon many, or all,
> citizens.  It raises money, contributed to a general fund, and spent for the benefits of
> the entire community.  The classic "regulatory fee" is imposed by an agency upon
> those subject to its regulation.  It may serve regulatory purposes directly by, for
> example, deliberately discouraging particular conduct by making it more expensive.
> Or, it may serve such purposes indirectly by, for example, raising money placed in
> a special fund to help defray the agency's regulation-related expenses.

967 F.2d 683, 685 (1st Cir. 1992) (citations omitted).  He then noted that "[c]ourts facing cases

that lie near the middle of this spectrum have tended . . . to emphasize the revenue's ultimate use,

asking whether it provides a general benefit to the public . . . or whether it provides more narrow

benefits to regulated companies or defrays the agency's costs of regulation."  *Id*.  Turning to the

particular facts before him, Judge Breyer determined that a charge of 3% of gross revenue

imposed by the Puerto Rico Public Service Commission upon private telecommunications

companies fell into this middle ground, but that upon close examination it was more akin to a

"regulatory fee."  *Id*. at 686.  Supporting his conclusion were the facts that the charge was

assessed by a regulatory agency, placed into a special fund, and used to cover the agency's

expenses, for example, equipment purchases.  *Id*.  Even though funds unspent by the agency after

---

[8]Although the TIA only mentions suits to "enjoin, suspend or restrain" state tax laws, the
Supreme Court has interpreted it also to bar suits for declaratory relief.  *Collins Holding*, 123
F.3d at 799 n.2 (citing *California v. Grace Brethren Church*, 457 U.S. 393, 407-11 (1982) and
*Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293 (1943)).

five years were supposed to be shifted to Puerto Rico's general tax fund where the money could be used to benefit the public at large, Judge Breyer found no evidence that a significant amount of funds had been, or were likely to be, moved to that fund. *Id*. at 687.

In *Bidart Bros. v. California Apple Commission*, the Ninth Circuit distilled the principles enunciated in *San Juan Cellular* into a formal, three-part test. 73 F.3d 925, 931 (9th Cir. 1996). The Fourth Circuit adopted this test in *Valero Terrestrial Corp. v. Caffrey*, stating:

> To determine whether a particular charge is a "fee" or a "tax," the general inquiry is to assess whether the charge is for revenue raising purposes, making it a "tax," or for regulatory or punitive purposes, making it a "fee." To aid this analysis, courts have developed a three-part test that looks to different factors: (1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge.

205 F.3d 130, 134 (4th Cir. 2000) (citations omitted). In close cases "the most important factor becomes the purpose behind the statute, or regulation, which imposes the charge." *Id*. (citation omitted); *see also Collins Holding*, 123 F.3d at 800 ("[T]he heart of the inquiry centers on function, requiring an analysis of the purpose and ultimate use of the assessment.").

A.

"An assessment imposed directly by a legislature is more likely to be a tax than one imposed by an administrative agency." *Collins Holding*, 123 F.3d at 800 (citations omitted). Here, the Maryland General Assembly passed the Act and is therefore responsible for the imposition of any assessments. However, the Fourth Circuit went on to say in *Collins Holding* that "[i]f the responsibility for administering and collecting the assessment lies with the general tax assessor, it is more likely to be a tax; if this responsibility lies with a regulatory agency, it is more likely to be a fee." *Id*. (citations omitted).

13

Under the Fair Share Act the responsibility for collecting any payments from companies that do not meet the threshold health care spending requirement is placed upon the Department of Labor, Licensing and Regulation, not the Comptroller of Maryland, whose principal duty is to collect taxes.  *See* Website of the Comptroller of Maryland, *Comptroller of Maryland Duties*, http://www.comp.state.md.us/main/about_the_comptroller/about_com/duties.asp.  This is not merely a formal matter but reflects the underlying reality that the potential assessment imposed by the Act upon noncompliant employers (more particularly, one noncompliant employer) is part and parcel of a regulatory process designed to implement a health care mandate.  Indeed, this regulatory process is allegedly so complicated that, as mentioned in Section III, *supra*, the Secretary argues the case will not even be ripe for review until the Department enacts implementing regulations.[9]

B.

"An assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class."  *Bidart Bros*., 73 F.3d at 931 (finding that an assessment was more like a regulatory fee because, *inter alia*, the impacted class consisted only of California apple producers) (citations omitted); *see also Antosh v. City of College Park*, 341 F. Supp. 2d 565, 568 (D. Md. 2004) (finding that a trash-collection charge was more like a tax because, *inter alia*, the impacted class consisted of all people who resided in single-family rental

---

[9]The Secretary points out that in *Valero*, where the Fourth Circuit upheld the district court's determination that the TIA applied, the assessment for solid waste disposal at issue was imposed by the West Virginia legislature but collected by landfill operators, not the general tax assessor.  However, the court noted that this method of collection was the most practical way to "ensure[ ] that the cost of the charge is passed from the transporter of the waste to the generators of the waste, so to spread the cost to a significantly wider proportion of the population."  *Valero*, 205 F.3d at 134.

homes or apartments).  Here, at its theoretical broadest the class affected by the Act consists of

four employers.  However, in light of the General Assembly's concerted efforts to exempt Johns

Hopkins and Northrop Grumman from any potential monetary assessment (and in light of the

fact that Giant Food unquestionably spends more than 8% of its payroll on health care), in reality

the class affected by the Act's spending requirement is composed of Wal-Mart alone.  A "class"

of one could not be narrower.

## C.

In applying the third factor of the *San Juan Cellular/Valero* test, relating to an

assessment's function and purpose, a court ordinarily asks whether ultimately the general public

will benefit from the revenue raised or whether the benefits "are more narrowly circumscribed."

*Valero*, 205 F.3d at 134.  If that were the proper focus of the inquiry here, the third factor would

weigh in favor of the Secretary because any revenue deposited into the Fair Share Fund would be

used to supplement Maryland's Medicaid budget.  In this case, however, framing the inquiry in

this manner begs the far more fundamental question: is the purpose of the charge to raise revenue

at all?  *See id*. (stating that the three factor test is only an "aid" in analyzing the central issue of

whether the charge is "for revenue raising purposes" or "for regulatory or punitive purposes").[10]

---

[10]The Secretary cites *Sonzinski v. United States* to argue that it is irrelevant whether Wal-Mart is likely to pay anything to the State in determining whether the General Assembly intended the Act to be a tax.  300 U.S. 506 (1937).  In *Sonzinski*, the Supreme Court upheld a yearly federal tax on the manufacture, sale, or importation of certain firearms against a challenge that the tax was an unconstitutional encroachment on the States' police power to regulate the sale of firearms.  In doing so, the Court said that "[i]nquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts."  *Id*. at 513-14 (citations omitted).  *Sonzinski* simply is not relevant here.  It did not involve the TIA at all, and the Secretary's argument is entirely inconsistent with the instruction of *Valero* that the ultimate question is whether the charge is "for revenue raising purposes" or "for regulatory or punitive purposes."  *Valero*, 205 F.3d at 134.  Moreover, in reaching its

If that is not its purpose, the TIA should not prohibit the issuance of an injunction, as it is

intended only to prevent federal litigation that would interfere with a State's administration of its

own fiscal operations.  *See Tully v. Griffin, Inc.*, 429 U.S. 68, 73 (1976).

The record makes clear the purpose of the Act is not to raise revenue but to require Wal-

Mart to spend an amount equal to at least 8% of its Maryland payroll on health care benefits for

its Maryland employees.  A remark made during the course of a floor debate by Senator Miller,

the President of the Maryland Senate and one of the Act's sponsors, is highly pertinent on this

point: "My colleague also says we should move away from government.  That is exactly what

this bill does.  *It moves away from government*.  It takes people who should be getting health

benefits at the work place off the rolls and it *requires those employers to provide it*."  Floor

Debate on Senate Bill 790, 2006 Leg., 421st Sess. (Md. Jan. 12, 2006) (emphasis added).

Moreover, the testimony before the Senate Finance Committee of a representative for Giant

Food, a company that lobbied for the Act, is also directly on point:

> If an employer in Maryland had to pay 8 percent or more, now do you think
> they would pay that money to the Maryland state government, or would they
> decide to give additional benefits to their own people?  I think they would
> choose to put that money to good use and to give it to their people in the
> form of better health care benefits.

Senate Finance Committee meeting on Senate Bill 790, 2005 Leg., 420th Sess. at 18-19 (Md.

Mar. 2, 2005) (testimony of Barry Sheer); *see also* Fiscal and Policy Note Revised 2005, H.B.

1284 at 2 (noting that momentum for the Act grew as other states "turned to Wal-Mart to assume

---

conclusion the Court noted that "the statute contain[ed] no regulatory provision related to a
purported tax in such a way as ha[d] enabled this Court to say in other cases that the latter is a
penalty resorted to as a mean of enforcing the regulations."  *Sonzinski*, 300 U.S. at 513 (citations
omitted).  Here, however, as discussed in the text, the regulatory purpose of the Act is clear.

more of the financial burden of *its workers'* health care costs") (emphasis added); *id*. at 4 (stating that "[t]o the extent large employers do not spend at least 6% or 8% on health insurance costs *as required*, Fair Share Health Care Fund special fund revenues could increase from employers' paying the difference between the *required* and actual amounts spent on health insurance") (emphasis added).[11]

Thus, the General Assembly neither intended nor contemplated that the Act would raise any revenue for the State.  To the contrary, its purpose was to force Wal-Mart to increase the level of its health care benefits.  The record further reflects that the Act would have precisely that effect.  The declaration submitted by Gregory Goggans, Wal-Mart's Director of United States Benefits Design, states without equivocation that Wal-Mart would increase its contribution to its employees' ERISA plans rather than pay the State.  Goggans Decl. ¶ 3; *see also* Amicus Curiae Brief of the Maryland Citizens Health Care Initiative Education Fund at 9 ("It makes better business sense to spend on benefits to one's own employees rather than to pay a tax into a general fund for low income residents' health care.").  Therefore, as a practical matter, this court's issuance of a declaratory judgment invalidating the Act will have no effect upon

---

[11]The legislative history of the Act is also of some relevance.  Although opponents of the bill sometimes characterized the assessment imposed by the Act as a "payroll tax," no sponsor of the Act ever referred to the assessment as a "tax."  Nor does the Act itself.  Moreover, the House of Delegates referred the bill to the Committee on Health and Government Operations, not to the Ways and Means Committee, which has jurisdiction over "state and local taxation matters."  *See* Fiscal and Policy Note Revised 2005, H.B. 1284.  While the Senate referred the bill to the Budget and Taxation committee as well as the Finance Committee, the Budget and Taxation Committee held no hearings and issued no report.  On the other hand, the Finance Committee - which has jurisdiction over "health and welfare" and "labor and employment" matters - issued a report after extensive hearings.  *See generally* Senate Finance Committee Hearing on Senate Bill 790, 2005 Leg., 420th Sess. (Md. Mar. 2, 2005).  Further, the Act was codified in Maryland's Labor and Employment Code, not its Tax Code.

Maryland's revenues at all.  All it would do would be to prevent Maryland from enforcing a health care regulation – something the TIA does not prohibit.

V.

Having found that RILA has standing to bring this action, that the issues are ripe for adjudication, and that the Tax Injunction Act does not divest this court of jurisdiction, I will now turn to RILA's contention that the Act is preempted by ERISA.

Section 514(a) of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by ERISA.  29 U.S.C. § 1144(a).  The Supreme Court has observed repeatedly that ERISA's preemption provision is "clearly expansive."  *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001).  At the same time, the Court has recognized that the term "relate to" cannot be given its most expansive meaning, or else "for all practical purposes pre-emption would never run its course."  *Id.*  In order to provide discipline to the ERISA preemption inquiry, the Court has held that a law "relates to" an ERISA plan if it has either a "reference to" or "connection with" such a plan.  *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983).  Because I find that the Fair Share Act has a "connection with" an ERISA plan and is preempted on that ground, I do not reach the "reference to" issue.[12]

---

[12]A state statute has a "reference to" ERISA where it "acts immediately and exclusively upon ERISA plans" or "where the existence of ERISA plans is essential to the law's operation." *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 325 (1997).  The reference in the Fair Share Act to ERISA plans is direct and express.  The payment required by the Act is measured, in part, by the amount of an employer's "health insurance costs" which the Act defines as "the amount paid by an employer to provide health insurance to employees." Md. Code Ann., Lab. & Empl. §§ 8.5-104(b) & 101(d)(1).  In *District of Columbia v. Greater Washington Board of Trade*, the Court found ERISA preemption on the basis of statutory language nearly identical to that used in the Fair Share Act.  506 U.S. 125, 130 (1992).  However, *Greater Washington Board of Trade* involved a city ordinance requiring employers that provided health insurance coverage for their employees to provide equivalent health

18

## A.

In determining whether a statute has a "connection with" an ERISA plan, a court must look to (1) "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive"; and (2) "the nature of the effect of the state law on ERISA plans." *Egelhoff*, 532 U.S. at 147.

In regard to the first factor, the main objective of ERISA's preemption clause is "to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657 (1995). "Uniformity is impossible, however, if plans are subject to different legal obligations in different States." *Egelhoff*, 532 U.S. at 148. The Fair Share Act creates health care spending requirements that are not applicable in most other jurisdictions. Moreover, its requirements directly conflict with the requirements of at least two other jurisdictions (New York City and Suffolk County, NY), N.Y.C. Admin. Code § 22-506(c)(2); Suffolk County, N.Y., Reg. Local Law § 335-3(A),[13] and conflict with similar pending legislation in many other states, *see, e.g.*, Oklahoma H.B. 2678, 50th Leg., 2d Sess. (2006) (requiring employee health care expenditures of 9% for for-profit employers); Minnesota H.F.

---

insurance coverage for injured employees eligible for workers' compensation benefits. Thus, the ordinance was a benefit-mandating statute that also had a "connection with" ERISA plans. It is not clear that if a statute did not mandate benefits or otherwise interfere with uniform funding and administration of ERISA plans, the Supreme Court would hold that literal application of the "reference to" language requires preemption.

[13]The fact that two local jurisdictions, New York City and Suffolk County, have enacted "fair share" legislation of their own highlights the uniformity problem. Unless such legislation is deemed to be preempted, nationwide employers potentially will face not only fifty different requirements imposed by the States, but also a virtually limitless number of requirements that local subdivisions in each State may enact.

2573, 84th Legis. Sess. (2006) (10%).  Further, as a consequence of the Act, a nationwide employer like Wal-Mart must segregate a separate pool of expenditures for its Maryland employees and structure its contributions – and employees' deductibles and co-pays – with an eye to how this will affect the Act's 8% spending requirement.

As to the second factor of the "connection with" test, the intended effect of the Act is to force Wal-Mart to increase its contribution to its health benefit plan, which is an ERISA plan, and the actual effect of the Act will be to coerce Wal-Mart into doing so.  Therefore, this factor is fully satisfied.

B.

My finding that the Act is preempted is in accordance with long established Supreme Court law that state laws which impose employee health or welfare mandates on employers are invalid under ERISA.  *See, e.g.*, *Greater Washinton Bd. of Trade*, 506 U.S. 125; *Shaw*, 463 U.S. 85.  The Secretary contends, however, that these authorities are not controlling because a trilogy of cases, *Travelers*, 514 U.S. 645, *Dillingham*, 519 U.S. 316, and *DeBuono v. NYSA-ILA Medical and Clinical Services Fund*, 520 U.S. 806 (1997), have "changed the landscape of ERISA preemption analysis."  The short answer to this contention, of course, is that this court has no authority to disregard Supreme Court precedent on the basis of the prediction that the Court would overrule its decisions.  *See Hohn v. United States*, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing validity.").

Moreover, the Secretary over-reads the cases upon which he relies.  Although, as the Fourth Circuit noted in *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1466-67, 1468 (4th Cir.

20

1996), the Supreme Court in *Travelers* "narrow[ed]" its "interpretation of the scope of ERISA preemption" and "adopted a pragmatic approach" to determining whether a state law "relate[s] to" an employee benefit plan, nothing in *Travelers* or its progeny suggests that the Court would now uphold a state statute or local ordinance mandating that an employer provide a certain type or monetary level of welfare benefits in an ERISA plan.  Indeed, in *Selman* itself, the Fourth Circuit recognized that "Congress intended ERISA to preempt at least three categories of state law that can be said to have a connection with an ERISA plan," including laws that "mandate[] employee benefit structures or their administration" and "laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice."  *Id*. at 1468.

A short description of the statutes involved in *Travelers*, *DeBuono*, and *Dillingham* is sufficient to demonstrate that they lie at the periphery of ERISA analysis, not (as does the Fair Share Act) at its core.  At issue in *Travelers* was a New York statute that imposed a surcharge on hospital rates for patients who were covered by commercial insurers or who participated in HMOs (as distinct from Blue Cross/Blue Shield).[14]  The surcharge was challenged by commercial insurers on the ground that it increased the cost paid by ERISA plans that contracted with the taxed entities.  The Court rejected the challenge, finding that the law had only an incidental effect on ERISA plans and did not "frustrat[e] plan administrators' continuing obligation to calculate uniform benefit levels nationwide."  *Travelers*, 514 U.S. at 658.

*Dillingham* involved a California wage law that permitted employers to pay a lower wage for apprentices only if the worker participated in a state-approved apprenticeship program.  In

---

[14]The surcharge was based upon the facts that Blue Cross/Blue Shield allegedly paid hospitals more promptly than other insurers and accepted subscribers whom other insurers rejected as unacceptable risks. *Travelers*, 514 U.S. at 658.

California many (but not all) apprenticeship programs are ERISA plans, and the plaintiff contended that the California statute "related" to ERISA plans because it provided economic incentives for ERISA-covered apprenticeship programs to meet the requirements for approval under California law.  The Court disagreed, finding, *inter alia*, that California's requirements were "substantively similar" to federal standards for apprenticeship programs, thereby reducing the possibility that "multi state apprentice programs . . . [would be] saddled with 'the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.'" *Dillingham*, 519 U.S. at 333 n.10 (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).

In *DeBuono*, an ERISA plan that owned and operated three medical centers challenged a New York tax "on gross receipts for patient services at hospitals, residential health care facilities, and diagnostic and treatment centers." *DeBuono*, 520 U.S. at 809-10.  Because the New York tax "target[ed]" the "health care industry" as a whole and thus "clearly operat[ed] in a field that has been traditionally occupied by the States," *id*. at 814 & n.10, the Court found no preemption.  As the Court further explained, the challenged law simply imposed "a tax on hospitals" and "[m]ost hospitals are not owned or operated by ERISA funds." *Id*. at 816.

The Fair Share Act stands in stark contrast to the statutes challenged in *Travelers*, *Dillingham*, and *DeBuono*.  The Act is not merely tangentially related to ERISA plans but is focused upon them.  Indeed, as the legislative history makes clear, the Fair Share Act is targeted directly at the ERISA plan of a particular employer.  Moreover, the economic effect of the Fair Share Act upon Wal-Mart's ERISA plan could not be more direct: it would require Wal-Mart to increase its health care benefits for Maryland employees and to administer its plan in such a

fashion as to ensure that the statutory spending required by the Act is met.  Thus, the Act violates

ERISA's fundamental purpose of permitting multi-state employers to maintain nationwide health

and welfare plans, providing uniform nationwide benefits and permitting uniform national

administration.[15]

C.

As an alternative defense to RILA's preemption claim, the Secretary argues that the Act

does not "mandate" that an employer of 10,000 or more employees must contribute an amount

equal to 8% or more of its payroll to its ERISA plan.  According to the Secretary, there are three

steps that an employer whose health care expenditures do not meet the statutory spending

requirement could take instead of increasing its health care benefits.

First, the Secretary suggests that an employer could comply with the Act by contributing

to Health Savings Accounts ("HSAs") for its employees.  However, HSAs fall outside the

definition of ERISA plans only if "the establishment of the HSAs is completely voluntary on the

part of the employees."  Employee Benefits Sec. Admin., U.S. Dep't of Labor, Field Assistance

Bulletin 2004-1, Apr. 7, 2004.  Therefore, an employer could not ensure its compliance with the

Act by contributing to HSAs; whether or not it met the statutory expenditure threshold would

---

[15]Of course, I am expressing no opinion on whether legislative approaches taken by other States to the problems of health care delivery and its attendant costs would be preempted by ERISA.  For example, the Commonwealth of Massachusetts has recently enacted legislation that addresses health care issues comprehensively and in a manner that arguably has only incidental effects upon ERISA plans.  In light of what is generally perceived as a national health care crisis, it would seem that to the extent ERISA allows, it is strongly in the public interest to permit states to perform their traditional role of serving as laboratories for experiment in controlling the costs and increasing the quality of health care for all citizens.

depend upon whether the HSAs were its employees' preferred means of receiving health benefits.

Second, the Secretary contends that an employee could comply with the Act by spending an amount equal to the requisite percentage of its payroll on first aid facilities.  This contention is based upon 29 C.F.R. §2510.3-1(c)(2), which excepts from the definition of ERISA plans "[t]he maintenance on the premises of an employer of facilities for the treatment of minor injuries or illness or rendering first aid in case of accidents occurring during working hours." While the Secretary's argument may evidence the active imagination of his lawyers, it is utterly out of line with reality.  It is through ERISA plans that health care is offered by all four of the employers subject to the Act's requirements, including Wal-Mart, at whom the Act is particularly directed.  Moreover, it demeans the seriousness of purpose of the Maryland General Assembly to suggest that it would address health care delivery and cost issues by enacting legislation that could result in a major employer providing health benefits to its employees by constructing first aid facilities to minister to minor injuries they have suffered.

The Secretary's third argument is that the Act by its terms does not require an employer to spend a certain amount on health care costs but rather simply provides that if the employer does not do so, it shall pay to the Secretary an amount equal to the difference between its actual health care expenditures and the required amount.  Again, while this is theoretically true, it does not even approximate reality.  If employers are faced with the choice of paying a sum of money to the State or offering an equal sum of money to their employees in the form of health care, no rational employer would choose to pay the State.  While repeatedly emphasizing that employers have a "choice," the Secretary does not offer a single reason why an employer would pay the

State rather than generate good will with its work force by increasing its employees' benefits. The "choice" here is a Hobson's choice. *See Travelers*, 514 U.S. at 664 (noting that a Hobson's choice "would be treated as imposing a substantive mandate").

Not only is this proposition self-evident, it is supported by all of the evidence in the record. As previously stated, Wal-Mart, the only company that the Act's assessment provision would affect, has submitted an affidavit that it would increase its contribution to its employees' ERISA plans rather than pay the State. Goggans Decl. ¶ 3. This common sense conclusion is conceded by one of the *amicus curiae* that has submitted a brief on behalf of the Secretary: "It makes better business sense to spend on benefits to one's own employees rather than to pay a tax into a general fund for low-income residents' health care." Amicus Curiae Brief of the Maryland Citizens Health Care Initiative Education Fund at 9. Moreover, that is precisely the result the General Assembly expected and intended. A statement made by Senator Miller, one of the Act's sponsors, quoted in Section IV.C, *supra*, makes clear that the purpose of the spending provision of the Act is to require increased payments for the provision of health benefits. Likewise, the testimony before the Senate Finance Committee of a representative of Giant Foods, which lobbied in favor of the bill, also quoted in Section IV.C, *supra*, confirms that any employer would give additional benefits to its own employees rather than paying money to the State. *See also* Fiscal and Policy Note Revised 2005, H.B. 1284 at 2-4.

VI.

The final question to be addressed is whether the Act violates the Equal Protection Clause. Because the Act relates to economic and social policy that does not create a suspect classification or infringe upon fundamental interests, it is presumed constitutional and "must be

upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993) (citations omitted).

Under this rational basis review, RILA has the burden of negating "every conceivable basis" for the Act. *Id*. at 315 (quoting *Lenhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).  Moreover, because a legislature is not required to articulate its reasons for drawing the classification at issue, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id*. (citations omitted).  "In other words, a legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.  Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function." *Id*. (citations and internal quotation marks omitted).

## A.

The ostensible purpose of the Act upon which the Secretary relies in defending against RILA's equal protection challenge is that it requires employers whose health care expenditures fall below the statutory minimum to contribute to a fund that will help defray the State's ballooning Medicaid costs.  RILA argues that given this purpose, the Act is irrationally underinclusive because fewer than 2% of Maryland employees work for employers with 10,000 or more employers.  Moreover, according to the State's own estimate, even if Wal-Mart were to pay a penalty equal to 1% of its payroll, that would yield about $2.7 million in revenue, which is an insignificant fraction of the State's $4.3 billion Medicaid budget.  *See* Fiscal and Policy Note

2005, H.B. 1284 at 3; Maryland FY 2007 Budget Highlights at 35, Sec'y Mot. to Dismiss ex. 5.

Indeed, such a payment would only offset Maryland's Medicaid costs by approximately $4.26

per enrollee (lowering the average expenditure from $6,839.70 to $6,835.44).  *See* Maryland FY

2007 Budget Highlights at 35.  Thus, RILA contends that the Act exempts the "vast majority of

Maryland employers who, when aggregated as a class, contribute to the problem" of the

burgeoning Medicaid expenditures "on a far greater scale than the handful of covered

employers."  RILA Mot. for Summ. J. at 28.  According to RILA, "[a] state that intends to

address a serious state-wide problem does not enact a law that it knows will affect only one

company."  *Id.*

RILA's contention is not without force.  There is no data in the legislative record (or in

the record before this court) concerning the number of employers in the State at various levels of

employment, *e.g.*, 100, 250, 500, 1,000, 2,000, 5,000, or 9,000 employees.  Likewise, there is no

data to show the amount that the Medicaid budget would be reduced if employers at different

levels of employment were covered by the Act.

Such information clearly was relevant to the asserted purpose of the Fair Share Act, and

it would be entirely reasonable to say that it is inherently irrational for a legislature to make a

classification (as the General Assembly did in adopting the 10,000 employee requirement)

without any underlying data to support it.  Moreover, although, as the Secretary contends,

classifications between "large" and "small" are routinely made by legislatures and generally

upheld by the courts, *see, e.g.*, *Bryant v. Zimmerman*, 278 U.S. 63 (1928) (upholding a New

York law that imposed certain requirements on associations with more than 20 members), a

classification  between employers who employ 10,000 or more and those who employ 10,000 or

less is an extraordinarily broad one.  Certainly, a legislature might have a legitimate concern not

to force a "small" employer out of business or, at least, to reduce its workforce, by subjecting it

to a mandatory benefit regulation.  However, that concern presumably would lead to a definition

of "small" that would not encompass an employer of 9,999 persons – the definition implicitly

contained in the Act.  *Cf*. 29 U.S.C. §630(b) (limiting the reach of the Age Discrimination in

Employment Act ("ADEA") to employers that employ "twenty or more employees for each

working day in each of twenty or more calendar weeks in the current or preceding calendar

year"); *see Birbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994).  Likewise,

although the law also generally permits classifications to be drawn between for-profit and non-

profit entities, *see, e.g.*, *Regan v. Taxation with Representation*, 461 U.S. 540 (1997), the

rationality of permitting a giant non-profit institution to provide substantially less health care

benefits to its employees than a comparably sized for-profit company is subject to question.[16]

---

[16]In contrast, the provision that results in Northrop Grumman being exempted from the payment requirement under the Act is clearly rational.  Md. Code Ann., Lab. & Empl. § 8.5-103(b).  The effect of that provision is to exclude, for purposes of calculating the percentage of payroll spent on health care, compensation paid above the median household income in Maryland.  To illustrate this by an easy example, assume that a for-profit employer has a total payroll of $200 million, $50 million of which is paid to persons who earn salaries above the median household income.  Assume further that the employer contributes $14 million to employee health care benefits.  If the portion of the payroll in excess of the median income is not excluded from the spending formula, the employer would not have met the minimum expenditure requirement of the Fair Share Act since $14 million is only 7% of $200 million.  On the other hand, if the higher-than-median portion of the payroll is excluded from the spending formula, the employer does meet the Act's expenditure requirement since $14 million is 10.7% of $150 million.  The latter calculation is rationally related to the ostensible purpose of the Act because, as RILA conceded at the hearing, employees' health care benefits do not generally increase with their salary or wages, and persons with a household income above the median in Maryland are, at least generally, not eligible for Medicaid benefits.

That said, under existing law RILA's equal protection challenge is unavailing.  The Supreme Court has made it clear that "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *Beach Commc'ns*, 508 U.S. at 313.  A necessary corollary of this principle is that legislatures are permitted the "leeway to approach a perceived problem incrementally."  *Id*. at 316 (citing *Williamson* v. *Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955)); *see also Dandridge* v. *Williams*, 397 U.S. 471, 485 (1970) (holding that a classification does not violate equal protection simply because it "is not made with mathematical nicety or because in practice it results in some inequality") (citation and internal quotation marks omitted); *Metropolis Theatre Co.* v. *City of Chicago*, 228 U.S. 61, 69-70 (1913) ("The problems of government are practical ones and may justify, if they do not require, rough accommodations -- illogical, it may be, and unscientific."); *Heath & Milligan Mfg. Co.* v. *Worst*, 207 U.S. 338, 354 (1907) (holding that equal protection does not require "logical appropriateness of the inclusion or exclusion of objects or persons," nor "exact wisdom and nice adaptation of remedies").

The cases RILA cites in support of its argument are not to the contrary.  In *Smith v. Cahoon*, the Court struck down a state regulation that required transporters of certain food products to carry accident insurance.  283 U.S. 553, 565-66 (1931).  As to the regulation's goal of protecting citizens who traveled on the highways with these transporters, the Court could discern no rational reason for "making a distinction between those who carry for hire farm products, or milk or butter, or fish or oysters, and those who carry for hire bread or sugar, or tea or coffee, or groceries in general, or other useful commodities."  *Id*. at 567.

Likewise, in *Williams v. Vermont*, the Court invalidated an automobile use tax that exempted from payment those who, while residents of Vermont, had bought and paid sales taxes for their automobile outside of the state, but denied the exemption to persons who had done the same before moving to Vermont.  472 U.S. 14 (1985).  Because such use taxes were "designed to protect a state's revenues by taking away the advantages to residents of traveling out of state to make untaxed purchases, and to protect local merchants from out-of-state competition which, because of its lower or nonexistent tax burdens, can offer lower prices," the Court held that it was irrational of the legislature to draw a line based on whether the purchaser lived in Vermont at the time of their purchase.  *Id*. at 24-25 (citations and internal quotations omitted).  So drawn, "there is no disincentive to the Vermont resident's purchasing outside the State, and there is a penalty on those who bought out-of-state but could not have been expected to do otherwise." *Id*.; *accord Hooper v. Bernalillo County Assessor*, 472 U.S. 612 (1985) (invalidating a statute that granted a tax exemption to Vietnam veterans which was limited to those veterans residing in-state before a certain date).

All that *Cahoon* and *Williams* stand for is the unremarkable proposition that legislatures cannot make distinctions that are *per se* irrational when considered in light of the purpose of the statute of which they are a part.  In the present case, the distinctions drawn by the General Assembly are not necessarily irrational in and of themselves.  What is lacking is any supporting information for the distinctions in the legislative record.  Under current Supreme Court law, this difference is one of constitutional significance and undermines RILA's equal protection challenge.

B.

30

RILA makes a secondary argument that the Act violates the Equal Protection Clause because it was intentionally targeted at Wal-Mart.  In support of this argument, RILA cites Justice Jackson's eloquent statement in his concurring opinion in *Railway Express Agency Inc. v. New York*, 336 U.S. 106, 112-13 (1949), that "nothing opens the door to arbitrary action so effectively as to allow . . . officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected."

Here, the legislation enacted by the General Assembly may well have been more thoughtfully considered (and the members of the Assembly more politically accountable) if it had subjected more than a single employer to its spending requirement.  However, unless there is a reason to "infer antipathy" from the targeting of a particular group or person, "[t]he Constitution presumes that . . . even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted."  *Beach Commc'ns*, 508 U.S. at 314 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).  It is only in cases involving politically vulnerable groups that the Supreme Court has appeared to rely, at least in part, on legislative antipathy when invalidating a law under the rational basis test.  *See Romer v. Evans*, 517 U.S. 620 (1996) (invalidating Colorado constitutional amendment that prohibited the state and local governments from passing laws to protect persons from discrimination based on their sexual orientation); *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432 (1985) (invalidating zoning ordinance that authorized a denial of a special use permit for mentally retarded persons to live together in a group home).  Wal-Mart does not contend that it is similarly situated to the

plaintiffs in *Romer* and *Cleburne*, and the fact that it is the only entity subject to the spending requirement of the Fair Share Act is not itself sufficient to make out a viable equal protection claim.  *See City of New Orleans v. Dukes*, 427 U.S. 297, 306 (1976) (expressly overruling *Morey v. Doud*, 354 U.S. 457 (1957)).

A separate order effecting the rulings made in this Opinion is being entered herewith.

Date:  July 19, 2006                          /s/_____
                                             J. Frederick Motz
                                             United States District Judge